FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 0 8 2017
Fairhurst, CG
CHIEF JUSTICE



This opinion was filed for record

at 8:00 am on June 8, 2017

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| COLUMBIA RIVERKEEPER; SIERRA CLUB; and NORTHWEST ENVIRONMENTAL DEFENSE CENTER, | ) ) ) ) ) ) | No. 92455-4 |
| Petitioners, | ) ) | En Banc |
| v. | ) ) | Filed  JUN 0 8 2017 . |
| PORT OF VANCOUVER USA; JERRY OLIVER, Port of Vancouver USA Board of Commissioners President; BRIAN WOLFE, Port of Vancouver USA Board of Commissioners Vice President; and NANCY I. BAKER, Port of Vancouver USA Board of Commissioners-Secretary, | ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Respondents. | ) ) |  |

WIGGINS, J.—Washington's Open Public Meetings Act (OPMA) requires that "[a]ll meetings of the governing body of a public agency shall be open and public . . . except as otherwise provided in this chapter." RCW 42.30.030. An exception to this open meeting mandate permits governing bodies to enter executive session "[t]o consider the minimum price at which real estate will be offered for sale or lease when public knowledge regarding such consideration would cause a likelihood of decreased price." RCW 42.30.110(1)(c). The parties dispute the scope of this exception as

applied to five executive sessions conducted by the Port of Vancouver USA (the Port). The scope of this "minimum price" exception is a matter of first impression.

We now hold that a government entity may enter executive session to discuss the minimum acceptable value to sell or lease property, but not to discuss all factors comprising that value. To the extent that various factors directly alter the lowest acceptable value, the governing body may discuss how these factors impact the minimum price; but general discussion of the contextual factors themselves must still occur at an open public meeting. As a result, we reverse the trial court's partial summary judgment in favor of the Port and remand for further proceedings consistent with our analysis.

## FACTS AND PROCEDURAL HISTORY

### I. Factual History[1]

In 2013, the Port negotiated a lease for a large rail terminal on public land with two private companies, Tesoro Corporation and Savage Companies. The two companies formed a joint venture to contract with the Port, creating Tesoro Savage Petroleum Terminal LLC. As approved, the Tesoro-Savage lease would be "the Port's largest single revenue generator," worth "upwards of $200 million to the Port." Resp'ts' Br. at 8 (Port Br.).

---

[1] Since this case is a review of a grant of summary judgment, "we consider all facts and make all reasonable factual inferences in the light most favorable to the nonmoving party," here, Columbia Riverkeeper, Sierra Club, and Northwest Environmental Defense Center. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).

The new project would receive large quantities of petroleum products by rail for export. Located on approximately 42 acres of the Port's property, the facility would handle roughly 120,000-360,000 barrels of petroleum products each day. Transporting these products would require between two and six trains per day, each train a mile and a half long in length. Once at the terminal, the petroleum products would then be loaded onto ships for export.

The Port evaluated the project in the context of its threefold mission to "1) maximize marine business and development, 2) maximize industrial business and development, and 3) generate and sustain diversified revenues." Clerk's Papers (CP) at 2491. Together, these three aims are part of a common effort "to enhance economic development for the benefit of our community." *Id.* at 1415. Because the Port's focus is fundamentally economic, the lease's benefits are similarly financial— both for the Port and for "the local community." Port Br. at 8.

For the Port, the lease's most obvious economic benefit is the monthly rent. Other financial benefits to the Port take the form of different kinds of fees: area maintenance fees, rail access fees, rail maintenance fees, wharfage fees, and service and facilities fees.[2] For the community, economic benefits involve new jobs and anticipated increases in regional spending. *Id.* (noting that the project will provide "hundreds of construction jobs and other permanent jobs for the community").

---

[2] The lease further requires Tesoro-Savage to spend money that does not go into the Port's coffers at all, including a lease security payment and various forms of insurance. The company is required to carry $1 million in property insurance, $10 million in liability insurance (per incident, up to $15 million in aggregate), and $25 million in pollution legal liability insurance.

According to the Port, the project would indirectly generate an estimated 2,700 local jobs peripheral to the project, as well as "$61 million in annual local purchases."

The lease's terms and associated benefits were negotiated by the Port's staff. While staff kept the Port's board of commissioners updated through summary documents and one-on-one conversations, commissioners had "no involvement with the negotiations of [the] lease." *Id.* at 9. According to the Port's executive director, Todd Coleman, commissioners generally render a decision only at the end of a lease approval process, when the board deliberates and votes to either accept or deny a lease.

Port staff is also responsible for determining the appropriate lease price. Staff recommends a minimum price, and the commissioners confirm that the number is reasonable.[3] According to the commissioners, they "are not directly involved" with setting the minimum price and "expect the staff to do the research."

In the case of the Tesoro-Savage lease, the Port's staff first presented the project to the entire board of commissioners in executive session—a meeting closed to the public. The Port commonly holds executive sessions; according to Commissioner Brian Wolfe, they occur "[a]bout 95 percent of the time" that a public

---

[3] The overall price of the lease negotiated by staff is distinct from the "land value" of the leased property itself. The value of the land is only part of the final agreement and does not include various fees related to use of the land. *See, e.g.,* CP at 1184 (describing the components of the lease price as including wharfage fees (the rate for moving commodities across the dock), the land lease, rail maintenance fees, rail usage fees, etc.). According to the Port's "current policies," the "land value" component for a real estate lease must be set according to fair market value. *Id.* at 1456. A separate real estate department sets this fair market value for land. *Id. But see id.* at 1416 (quoting Commissioner Jerry Oliver indicating that the Port "usually" follows the real estate department's recommendation, "but not always").

meeting is also held. The Port meets in executive session in order to prevent "poaching" by other ports; seen as rivals for valuable tenants, neighboring ports might undercut a fledgling lease deal. *Id.* at 1471.

In order to avoid this "poaching," the Port discusses "basically all topics" related to real estate in executive sessions. *Id.* These topics, in turn, influence the price at which real estate will be offered for lease. For example, the Port describes the components "that must be identified and analyzed to determine [the lease's] ultimate price" as including

> the amount of property to be leased; the market value of any existing feature or amenities of the site; the duration of the lease; any required investments or improvements by the Port; the Port's expected return on investment in the short and long term, and whether the lease represents the highest return to the Port for that location; the projected flow of potential revenue streams; the feasibility of the lease rate, including the financial strength of the tenant, the stability of the tenant's business industry, and any tenant risks that must be mitigated;[4] and the direct and indirect economic benefits for the local community (including family-wage jobs).

Opp'n to Mot. for Discr. Review at 3-4. Because changes to any of these terms would change the acceptable lease price for a particular property, the terms themselves were the subject of executive session discussion.

The Port held at least seven executive sessions to discuss the Tesoro-Savage project between March and July 2013. Two of the meetings are not at issue on this appeal because the trial court denied the Port's motion for summary judgment seeking

---

[4] Tenant risks include possible "untrustworthy" tenants, CP at 1423, environmental cleanup capacity, *id.* at 1470, and "operating experience," *id.* at 1425.

dismissal of claims as to those two meetings. In their briefing, the parties generally agree as to the contents of the remaining five meetings as to which the trial court granted summary judgment of dismissal.

### A. *March 26, 2013 Executive Session*

In this executive session, the Port's staff presented the Tesoro-Savage lease terms to the board of commissioners. The Port discussed the values staff had negotiated for the base lease rate, wharfage fees, dockage fees, and rail fees, as well as the proposed duration of the exclusivity agreement. The Port also discussed another unrelated real estate matter and a litigation issue.

### B. *July 9, 2013 Executive Session*

In this executive session, the Port discussed the implications of Tesoro-Savage forming a limited liability company. According to Commissioner Wolfe, there was some concern that the new joint venture entity might be "merely a shell without adequate assets," unable to perform environmental cleanup if necessary. The Port also discussed unrelated national security and litigation matters.

### C. *July 16 and 17, 2013 Executive Sessions*

Over two days totaling approximately eight hours, the Port's discussion in these back-to-back executive sessions was broad-ranging. Topics included "what type of crude would flow through the facility and its risks, timelines for Tesoro-Savage to begin and complete construction, the length of the operating term, and whether extensions would be allowed . . . ." Port Br. at 11.

D. *July 23, 2013 Executive Session*

In this executive session, held before a vote in public later that day, the Port contemplated requiring the Port's approval of Tesoro-Savage's safety plan before the project could commence operation. This new lease term had been proposed the night before, after substantial public comments in a public workshop.

Outside of these executive sessions,[5] the Port also held public workshops in May, June, and July 2013, taking public comments at each one. Two formal public meetings were then held, the first on July 23, 2013, before this lawsuit was filed. This first meeting presented an overview of the lease to the public, followed by the commissioners' public vote approving the lease.

The second meeting took place after this action was filed. Due to faulty announcement procedures in connection with the first public meeting, *see infra* note 8, the Port decided to operate under the assumption that the July 23 vote was not effective. In what the Port described as "an abundance of caution," it held a new open meeting and conducted a new vote on October 22, 2013. The meeting lasted about two hours and the Port again approved the lease.

---

[5] As noted *infra* p. 9, the commissioners met in additional executive sessions on April 9 and July 22, 2013, but the validity of these meetings is not before us because the trial court denied summary judgment as to these two meetings.

## II. Procedural History

On October 2, 2013, Columbia Riverkeeper, Sierra Club, and Northwest Environmental Defense Center sued the Port and its commissioners.[6] All three plaintiffs (collectively Riverkeeper) are nonprofit organizations dedicated to environmental issues. Columbia Riverkeeper in particular is concerned with the restoration and protection of the Columbia River Basin.

In its first amended complaint, Riverkeeper claimed that the Port's July 22, 2013, executive session included topics that should have been discussed in a public meeting. As a result, Riverkeeper asked that the meeting and the lease approval be declared invalid and that the Port be required to retrace its steps before reapproving the lease. *See* Report of Proceedings (RP) (July 24, 2015) at 7 (quoting Riverkeeper's counsel requesting that "[t]he lease . . . be declared null and void until defendants retrace their steps and disclose the content of their unlawful deliberations").

After the Port held its second formal public meeting on October 22, Riverkeeper filed an amended complaint on October 31, 2013. This revised complaint noted the additional meeting and added various State Environmental Policy Act (SEPA) claims.[7] Ch. 43.21C RCW.

---

[6] The lawsuit named as defendants Jerry Oliver, Brian Wolfe, and Nancy Baker in their official capacities as the Port's commissioners. Unless otherwise specified, we refer to the respondents collectively as "the Port."

[7] Riverkeeper's SEPA claims were the subject of a related appeal, *Columbia Riverkeeper v. Port of Vancouver USA*, 188 Wn.2d 80, 392 P.3d 1025 (2017).

On summary judgment, the trial court held that any problems associated with the July 22 meeting were adequately corrected by the October 22 meeting and vote, and by the adoption of a "revised executive session announcement procedure." CP at 948. The new announcement procedure consisted of a checklist allowing the Port to indicate which statutory exception an executive session invoked.[8] The court continued the remainder of the OPMA claims, pending further discovery.

After discovery, Riverkeeper filed its second amended complaint. This complaint alleged further OPMA violations by the Port at meetings conducted between February and July 2013—a period that includes the five executive sessions now before us.

In a second summary judgment order, the trial court held that each of the five executive sessions complied with the OPMA. The court further found that genuine issues of material fact precluded summary judgment as to the April 9 and July 22 executive sessions. The trial court's order specifically embraced the Port's interpretation of the OPMA's "minimum price" exception: "[F]actors other than a bare numeric term are essential to an ultimate determination of price, and . . . the statute includes a necessary degree of latitude beyond the bare numeric terms." The court found that discussing issues relevant to price was a necessary part of considering the price itself, holding that the Port could discuss in executive session "(1) information

---

[8] The checklist was developed in response to the faulty announcement of the July 22 executive session, in which Commissioner Oliver said that the commissioners would "discuss . . . the public testimony . . . ." The Port conceded that the announcement of this session was flawed.

that would give the customer an advantage in negotiating a lower price; and (2) information that would give a competitor an opportunity to negotiate with the Port's customer, thus creating a bidding process that would decrease the Port's price."

The court then concluded that interpretation of the "minimum price" exception was "a question of first impression . . . as to which there is substantial ground for a difference of opinion and immediate review of the order may materially advance the ultimate termination of the litigation." The remaining proceedings were stayed pending appellate review.

Riverkeeper filed a petition for discretionary review by this court, seeking review of three issues: (1) the trial court's interpretation of the OPMA, (2) the trial court's determination that five of the Port's meetings were lawful and that two remained inconclusive, and (3) the trial court's mootness ruling related to Riverkeeper's request for injunctive relief against the lease.[9] We granted review of the trial court's interpretation of the OPMA's "minimum price" exception and the determination that the five meetings—on March 26, July 9, July 16, July 17, and July 23, 2013—were lawful. The trial court's mootness ruling solely concerned errors associated with the

---

[9] Riverkeeper's brief to this court raises a tangential challenge to the trial court's interpretive approach, disputing the court's use of testimony by the board of commissioner's general counsel, Alicia Lowe, when discerning how to properly interpret the OPMA's minimum price provision. Pet'rs' Opening Br. at 47 (Riverkeeper Br.). This evidentiary issue was not raised in the petition for review. *See* Port Br. at 39-40. We generally do not consider new issues not raised in the petition and thus accepted for review by this court. *See* RAP 13.7(b) ("the Supreme Court will review only the questions raised in the motion for discretionary review"). We therefore decline to consider the issue.

July 22 meeting, which is not before us; as a result, we did not grant review of the mootness issue.[10]

Because we disagree with the trial court's interpretation of the "minimum price" exception, we reverse the grant of summary judgment for each of the five meetings.

## STANDARD OF REVIEW

We review summary judgments de novo. *Scrivener*, 181 Wn.2d at 444. Summary judgment is appropriate where there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We construe evidence and inferences from the evidence in favor of the nonmoving party. *Scrivener*, 181 Wn.2d at 444.

The construction and meaning of a statute is a question of law that we also review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). When possible, the court derives legislative intent from the plain language enacted by the legislature, considering the text of the provision in question, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 10-11.

## ANALYSIS

The crux of the parties' dispute is whether the OPMA permits the governing body of a public entity to discuss in executive session all factors influencing the price

---

[10] Because we are reviewing only claims for declaratory relief, Riverkeeper requests no relief beyond reversal of summary judgment. Riverkeeper Br. at 49.

to sell or lease property. The OPMA's "minimum price" exception allows governing bodies to enter executive session "[t]o consider the minimum price at which real estate will be offered for sale or lease when public knowledge regarding such consideration would cause a likelihood of decreased price." RCW 42.30.110(1)(c).

The Port argues for a broad interpretation by which government entities could "consider in executive session the key deal factors that drive the minimum price . . . ." Port Br. at 3. Riverkeeper argues for a narrow interpretation, limiting discussion to "the least amount of money to be accepted for a lease." Pet'rs' Opening Br. at 27 (Riverkeeper Br.). In the alternative, Riverkeeper offers a middle ground approach—allowing "some discussion of the reasons supporting a particular price," but with the executive session "still . . . confined to deliberations focused on setting the minimum price." Pet'rs' Reply Br. at 3, 7. Thus, in a question of first impression, we are asked to clarify the exception's scope.

The clear language of the statute limits discussion in executive session to consideration of the lowest acceptable value to sell or lease property. To the extent that various factors directly alter the lowest acceptable value, the governing body may discuss how these factors impact the minimum price. This limited scope does not permit a general discussion of the contextual factors themselves; any such general discussion must occur at an open public meeting. Once the relevant factors have been discussed in public session, then, armed with this knowledge, the governing body may enter executive session; there, the governing body can apply this knowledge to set a new minimum price. This interpretation is supported by the

statutory mandate to liberally construe open meetings protections, by the provision's legislative history, and by the rule's practical implications.

Because this case is before us on interlocutory review, and because the trial court has yet to consider the validity of these meetings with adequate interpretive guidance, we reverse the partial summary judgment and remand for further proceedings consistent with this analysis.

## I. The OPMA Broadly Ensures Government Transparency

The OPMA is Washington's comprehensive transparency statute.[11] Enacted in 1971, the Act seeks "to ensure public bodies make decisions openly."[12] *Miller v. City of Tacoma*, 138 Wn.2d 318, 324, 979 P.2d 429 (1999). "[T]he purpose of the Act is to allow the public to view the decisionmaking process at all stages."[13] *Cathcart v. Andersen*, 85 Wn.2d 102, 107, 530 P.2d 313 (1975). In order to ensure this oversight of government entities, the OPMA requires that "[a]ll meetings . . . be open and public."[14] RCW 42.30.030. This general rule is subject to a series of exceptions. RCW 42.30.110.

---

[11] The OPMA is similar to statutes in many other states. *See* William R. Sherman, *The Deliberation Paradox and Administrative Law*, 2015 B.Y.U. L. REV. 413, 432 (2015) (noting that "Washington State's Open Public Meetings Act is typical"); *see also id.* at 432 n.84 (describing similar state laws in California, Idaho, Iowa, Kansas, and Tennessee).

[12] A public body includes "all public commissions, boards, councils, . . . and all other public agencies of this state and subdivisions thereof. . . ." RCW 42.30.010. The parties agree that the OPMA applies to the Port.

[13] Transparency statutes seek to protect and promote an engaged democratic process. *See Detroit Free Press v. Ashcroft*, 303 F.3d 681, 683 (6th Cir. 2002) (noting that "[d]emocracies die behind closed doors").

[14] A "meeting" is defined as "meetings at which action is taken." RCW 42.30.020(4). An "action" is defined as "the transaction of the official business of a public agency by a governing

## II. The "Minimum Price" Exception Narrowly Permits Executive Sessions

The "minimum price" exception of RCW 42.30.110 allows government entities to hold executive sessions

> [t]o consider the minimum price at which real estate will be offered for sale or lease when public knowledge regarding such consideration would cause a likelihood of decreased price. However, final action selling or leasing public property shall be taken in a meeting open to the public.

RCW 42.30.110(1)(c). We have not previously interpreted this exception.

When interpreting a statute, the court's fundamental objective is to ascertain and give effect to the legislature's intent. *Hama Hama* Co. *v. Shorelines Hr'gs Bd.,* 85 Wn.2d 441, 445, 536 P.2d 157 (1975). We begin with the plain meaning of the statute. *See Campbell & Gwinn,* 146 Wn.2d at 9. In doing so, we consider the text of the provision, the context of the statute in which the provision is found, related provisions, amendments to the provision, and the statutory scheme as a whole. *Id.* at 10-11. If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent. *Id.* "[W]e may discern the plain meaning of nontechnical statutory terms from their dictionary definitions." *State v. Cooper,* 156 Wn.2d 475, 480, 128 P.3d 1234 (2006). If, after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history. *Campbell & Gwinn,* 146 Wn.2d at 9.

---

body including but not limited to . . . deliberations, discussions, considerations, . . . and final actions." RCW 42.30.020(3). The parties agree that the gatherings at issue were meetings at which action was taken, subjecting these sessions to the OPMA's transparency requirements.

The OPMA adds an additional lens to this interpretive process; the statute itself declares that its protections "shall be liberally construed." RCW 42.30.910. Liberal construction requires that we resolve ambiguous provisions in favor of government transparency. *See Ross v. State Farm Mut. Auto. Ins. Co.*, 132 Wn.2d 507, 515, 940 P.3d 252 (1997). Liberally construing the statute's protections further "'implies a concomitant intent that its exceptions be narrowly confined.'" *Miller*, 138 Wn.2d at 324 (quoting *Mead Sch. Dist. No. 354 v. Mead Educ. Ass'n*, 85 Wn.2d 140, 145, 530 P.2d 302 (1975)). As a result, where multiple reasonable interpretations of an exception are available, we are directed to adopt the narrowest of the alternatives.[15]

Here, the parties offer three different interpretations of the "minimum price" exception. The Port argues that discussing "minimum price" necessarily includes discussion of all information that might influence price. Because topics such as safety issues, job creation, liability allocation, and environmental impacts are relevant to the lease price, the Port argues that its executive sessions discussing all of these factors fall within the OPMA's "minimum price" exception.

---

[15] The Port would modify this approach to interpreting the OMPA: "[W]hile exceptions to open government provisions should be strictly construed, the OPMA should not be construed to disadvantage a public entity in confidential communications." Port Br. at 5. The Port relies on *Port of Seattle v. Rio*, 16 Wn. App. 718, 724, 559 P.2d 18 (1977) (holding that a government entity "should neither be given an advantage, nor placed at a disadvantage in litigation" because "public agencies are entitled to effective legal representation"). *Rio* is rooted in government entities' independent right to receive confidential attorney-client communications. *Id.* The Port offers no authority suggesting that a government actor has a corresponding independent right not to be disadvantaged in commercial negotiations. As a result, we decline to abridge the OPMA's direction that its protections be liberally construed.

Riverkeeper argues that discussing "minimum price" means discussing numbers alone—that is, the lowest number of dollars at which real estate will be offered for lease or sale. Contextual discussion, under this approach, would be foreclosed entirely.

If some discussion beyond bare numbers is necessary, Riverkeeper offers a compromise interpretation—contextual references to the reasons behind a particular minimum price would be permitted where necessary to make the discussion coherent. However, the discussion itself would still be focused on setting the minimum number of dollars.

The parties' interpretations rely on different characterizations of (1) the plain language of the statute, (2) the legislative history of the statute, and (3) the practical import of a narrow interpretation of the statute. We address each factor in turn.

### A. Plain Language

We discern a statute's plain language by considering the text itself, amendments to the statute, and related statutory provisions. *Campbell & Gwinn*, 146 Wn.2d at 10-11. We begin with the text.

### 1. The Text

The "minimum price" exception permits a government entity to convene in executive session

> [t]o consider the minimum price at which real estate will be offered for sale or lease when public knowledge regarding such consideration would cause a likelihood of decreased price. However, final action selling or leasing public property shall be taken in a meeting open to the public.

RCW 42.30.110(1)(c). The scope of this provision is tied to its opening phrase "to consider the minimum price." To "consider" means to "think about with a degree of care or caution." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 483 (2002); *see also In re Parental Rights to K.J.B.*, 187 Wn.2d 592, 603, 387 P.3d 1072 (2017). Carefully thinking about price, the Port explains, "encapsulates those things that necessarily affect price." Port Br. at 23. We disagree. The phrase "things that necessarily affect" is not in the statute. The subject of careful thought must be the price itself.

The word "price" is defined as follows:

> [archaic definition omitted] **2 a** : the quantity of one thing that is exchanged or demanded in barter or sale for another[;] a ratio at which commodities and services are exchanged . . . **b** : the amount of money given or set as the amount to be given as a consideration for the sale of a specified thing . . . **3** : the terms or consideration for the sake of which something is done or undertaken : as **a** : an amount or gain sufficient to bribe one : something for which one is prepared to sacrifice probity, responsibility, or other quality or duty . . . .

WEBSTER'S, *supra*, at 1798. Price can thus reasonably mean either (1) a single monetary amount or (2) a mix of terms or elements of consideration.[16] "Minimum"

---

[16] Amicus Washington Public Ports Association (WPPA) argues that the word "price" is further expanded by the statute's subsequent phrase "such consideration." Br. of Amicus Curiae WPPA at 9; *see* RCW 42.30.110(1)(c) ("when public knowledge regarding *such consideration* would cause a likelihood of decreased price" (emphasis added)). "The Legislature," WPPA claims, "uses the term 'such consideration' to refer to its immediately prior use of 'price', indicating such terms are interchangeable in this exemption." WPPA Br. at 9. "Consideration," WPPA continues, refers to the legal term by which some value is conveyed or legal burden incurred. *Id.* There are two problems with this analysis. First, it inappropriately relies on a technical definition of "consideration," as used in a legal or contractual setting. There is no reason to assume that the word is used in a technical sense. *See Cooper*, 156 Wn.2d at 480 (noting that we "discern the plain meaning of nontechnical statutory terms from their dictionary definitions"). Second, the argument overlooks the use of

also constrains this definition, meaning "of, or relating to, or constituting a minimum :

least attainable or possible . . . ." WEBSTER'S, *supra*, at 1438.

Taken together then, "to consider the minimum price" means to carefully think

about the least acceptable amount of money or benefits to be accepted for a piece of

property. Under this plain meaning, an executive session must be specifically

concerned with the minimum price and information discussed must be tied to that

minimum price.

2. The Statute as a Whole

Plain language interpretation of a statute looks not only to the provision in

question, but to other related provisions that illuminate legislative intent. *Campbell &*

*Gwinn*, 146 Wn.2d at 11. In the Act's opening provision, the legislature set forth the

statute's general purpose:

> The legislature finds and declares that all public commissions, boards,
> councils . . . and all other public agencies of this state and subdivisions
> thereof exist to aid in the conduct of the people's business. It is the intent
> of this chapter that their actions be taken openly and that their
> deliberations be conducted openly.
>
> The people of this state do not yield their sovereignty to the
> agencies which serve them. The people, in delegating authority, do not
> give their public servants the right to decide what is good for the people
> to know and what is not good for them to know. The people insist on
> remaining informed so that they may retain control over the instruments
> they have created.

---

the derivative word, "consider," in the preceding clause, highlighted by the word "such."
"Such" means "previously characterized or specified." WEBSTER'S, *supra*, at 2283. Here, the
phrase "such consideration" points backward to the previously stated derivative word
"consider," not to the word "price."

RCW 42.30.010. This is "some of the strongest language used in any legislation." *Equitable Shipyards, Inc. v. State*, 93 Wn.2d 465, 482, 611 P.2d 396 (1980). We are not permitted to frustrate these goals of transparency and popular sovereignty by approving expansive discussion in executive session of matters squarely in the public interest. Here, the Tesoro-Savage lease involved topics that were clearly matters of substantial public concern, including environmental risks, public safety hazards, and local economic impacts. A broad construction of the "minimum price" exception thus would invade the people's right to decide for themselves "what is good for [them] to know and what is not good for them to know." RCW 42.30.010.

Similarly, the breadth of other provisions providing for discussion in executive session contrasts with the narrowness of the "minimum price" exception. "When the legislature uses different words within the same statute, we recognize that a different meaning is intended." *State v. Beaver*, 148 Wn.2d 338, 343, 60 P.3d 586 (2002). Consider the OPMA exception allowing wide-ranging discussion in executive session with legal counsel:

> [t]o discuss with legal counsel . . . litigation or potential litigation to which the [government entity] . . . is, or is likely to become, a party . . . ."

RCW 42.30.110(1)(i). Whereas this exception refers to all actual or potential litigation, the "minimum price" exception is much more narrowly drawn. Far from permitting discussion of real estate generally, it allows executive sessions only

> [t]o consider *the minimum price at which real estate will be offered* for sale or lease when public knowledge regarding such consideration would cause a likelihood of decreased price. . . .

RCW 42.30.110(1)(c) (emphasis added). Because the "minimum price" exception uses more limited language, the exception more strictly limits executive sessions.

These related statutory provisions reinforce the specific textual analysis of the "minimum price" exception. The legislature plainly did not intend to allow pervasive discussion of important public issues behind closed doors. The legislature was fully capable of creating such a broad exception had it wished to. It did not.

### 3. Statutory Amendment

Plain language analysis also looks to amendments to the statute's language over time. *Campbell & Gwinn*, 146 Wn.2d at 10-11. In this case, the legislature amended the "minimum price" exception in 1985, adopting the provision's final sentence: "However, final action selling or leasing public property shall be taken in a meeting open to the public." SUBSTITUTE S.B. 3386, at 1, 49th Leg., Reg. Sess. (Wash. 1985) (underline omitted). The Port argues that this amendment serves as the "boundary for a public entity's discussions while in executive session, and in turn leaves room for discussions on topics that drive price so long as they do not cross that boundary, *i.e.*, reach a final decision . . . ." Port Br. at 27. However, the legislative report on this amendment specifically stated that the legislature did not intend this new sentence to modify the existing exception:

> Specific, nontechnical, modifications of existing law are as follows:
>
> (1) The authorization to discuss, in executive session, the minimum price at which public property may be sold or leased *is left intact*. However, the law is amended to clarify that final action must be taken at a meeting open to the public.

HOUSE COMM. ON STATE GOV'T, H.B. REP. ON SUBSTITUTE S.B. 3386, at 2-3, 49th Leg., Reg. Sess. (Wash. 1985) (emphasis added). The Port offers no authority suggesting that the legislature meant to undercut precisely the protection it purported to leave whole. As a result, the plain language analysis of the statutory protection remains unaltered. "To consider the minimum price" means to think carefully about the least acceptable value, not to discuss the factors contributing to that value.

Lastly, even if a broad reading were consistent with the plain language of the statute, we would still interpret exceptions to the OPMA narrowly. *See* RCW 42.30.910. Thus, where multiple interpretations of the exception are reasonable, we must adhere to the narrowest alternative.

### B. Legislative History

The "minimum price" exception's legislative history reinforces the provision's narrow scope. The exception was passed in 1979 as Substitute House Bill 248, and sought to prevent "potential buyers" of public real estate from becoming "aware of [the government entity's] minimum price and, therefore," failing to "offer the public agency a higher price." H.B. REP. ON SUBSTITUTE H.B. 248, at 1, 46th Leg., Reg. Sess. (Wash. 1979). The new legislation thus protected only the government's bottom-line price from public disclosure.

In floor debate, one of the bill's sponsors explained the purpose of the exception in detail:

> What this bill then is trying to accomplish is to say that the public body could hold a[n] . . . executive session . . . when it is considering the sale or lease of property, but the executive session would be limited to deciding how high or how low they are willing to go on—in terms of negotiation with the other entity that is concerned. All other aspects

relating to the sale or lease of the property . . . , the decision to sell or lease and the reasons for it and what property might be sold or leased and so on would have to be conducted in open meeting and only the details of the proposed negotiation with respect to the price could be conducted in executive session.

46 S. Floor Proceedings, SUBSTITUTE H.B. 248 (Mar. 2, 1979) at 73:44 to 74:35 (Mar. 2, 1979, Floor Proceedings) (statement of Sen. Wilson), https://www.digitalarchives.wa.gov/Media/25/297/858/a160dbba-ec84-4a51-ac94-3bde2e2a08bd.mp3.

Opposition to the bill expressed concern that "chicanery will take place" if disposition of property were discussed in executive session. H.B. REP. ON SUBSTITUTE H.B. 248, at 1. Responding to these concerns, the executive director of the Washington Public Ports Association (WPPA) sent a letter reassuring the legislature that discussion in executive session would be limited:

> The rationale for this [bill] is quite simple. Any publicly known minimum terms or prices will become, during purchase or lease negotiations, the maximum price offered by the potential purchaser or lessee. . . .
>
> *The intent of this bill is not to transact real estate business in secret.*

Letter from Lewis R. Holcomb, Exec. Dir. of Wash. Pub. Ports Ass'n, to Members of the Senate Rules Comm. 1 (Mar. 1, 1979) (WPPA Ltr.) (emphasis added).

In light of these statements, we reject the suggestion that the legislature intended to allow private discussion of all topics related to real estate, so long as those topics impact price. On the contrary, the legislature plainly sought to limit discussion in executive sessions to the negotiation's backstop amount, that is, "how high or how low" the price might go, while nonetheless requiring that "[a]ll other aspects" of a sale

or lease be discussed in public.[17] Mar. 2, 1979, Floor Proceedings at 74:00 to 74:02, 74:09 to 74:11 (statement of Sen. Wilson). Thus, the Port's interpretation would achieve precisely what the legislature sought to prevent: "real estate business" being discussed "in secret." WPPA Ltr. at 1.

In sum, the statutory provision's legislative history supports, rather than rebuts, a narrow interpretation of the exception's scope, confining discussion in executive session to the lowest acceptable monetary value for the sale or lease of property.

### C. Practical Implications

The Port argues that a broader interpretation is nonetheless necessary because (1) discussing unmoored numbers in executive session is impractical and (2) disclosing key deal terms would undermine the Port's "negotiating power." Port Br. at 17. Either outcome, the Port states, would be absurd. *Id.* at 23. We disagree.

We "avoid [a] literal reading of a statute" only when doing so "would result in unlikely, absurd, or strained consequences." *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002). We use the canon of avoiding absurd results sparingly because it "refuses to give effect to the words the legislature has written." *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 311, 268 P.3d 892 (2011) (further noting that the absurd

---

[17] We appreciate that a binary "high or low" conception of price may appear excessively simplistic in light of the Port's complex lease agreements. As the trial court noted, "[T]he legislature gave us this one clause with one word[—price—]that fails to take into account in a transaction of this size and complexity and scope the multitude of possible factors that play into the decision-making of this agency body." RP (July 24, 2015) at 54. We must nonetheless apply the rule we are given.

results canon "necessarily results in a court disregarding an otherwise plain meaning and inserting or removing statutory language, a task that is decidedly the province of the legislature"). With these cautionary principles in mind, we proceed to consider the Port's twin practicality arguments.

1. Focusing Discussion on Setting the Lowest Acceptable Value Is Practical

The Port's concern that discussing unmoored numbers is impractical also animated the trial court's opinion. The court noted that the word "price" alone "fails to take into account . . . the multitude of possible factors that play into the decision-making of this agency body. RP (July 24, 2015) at 54. "And the notion of price taken by itself in a vacuum really means nothing. Price . . . is a function of a prior equation." *Id.* As a result, the court reasoned, there must be "a necessary degree of latitude" to permit the Port "to discuss in executive session many things which go into the price of a particular transaction." *Id.* at 55. We disagree with this analysis in two respects.

First, while the Port is correct that effectively considering price must factor in "those things that necessarily affect price," the Port is incorrect that the commissioners need to learn about or discuss "those things" in executive session. Port Br. at 23. The factors behind price—the quantity of land, the environmental impacts, the property improvements, etc.—can and must be discussed in public even if their specific dollars-and-cents impact on price is considered in executive session. Having educated themselves on the issues relevant to the property in an open session, commissioners can then retire to executive session to decide an appropriate minimum value for the lease or sale of that property.

Second, the Port is mistaken that focused discussion on the appropriate minimum value restricts the conversation in executive session to mere numbers, detached from meaning. Commissioners can properly reference the reason for a particular price without making those factors the focus of discussion. Again, focus is key. Contextual references are appropriate so long as the goal and outcome of the discussion remains identification of the lowest acceptable value. Pet'rs' Reply Br. at 7.

2. <u>Focusing Discussion on Setting the Lowest Acceptable Value Does Not Impermissibly Jeopardize the Port's Negotiating Power</u>

The Port's concern that its negotiating power would be jeopardized appears to be more deep-seated, and reflects many of the commissioners' comments: The region's ports, we are assured, are "cutthroat competitors." CP at 1427 (quoting Commissioner Jerry Oliver). The Port claims that publicly discussing key deal terms would open up the deal to "poaching" by rival ports. For instance, disclosing environmental impacts in public "might enhance another port in [its] competitive pursuit of this potential tenant because [the other port] might be willing to make concessions that our port would not . . . ." *Id.* at 1423 (Commissioner Oliver). "The public," Commissioner Oliver further cautioned, "includes our competitors." *Id.* at 1428. Thus, while the Port and its commissioners "try to be transparent [with the public,] . . . sometimes we feel that it is necessary to restrict the flow of information to protect either our tenant or ourselves from competitive influences." *Id.* (Commissioner Oliver). To do otherwise would prevent the Port from meeting "its obligation to maximize the value for public property." Port Br. at 28.

The OPMA is crystal clear in its response to such arguments: "The people . . . do not give their public servants the right to decide what is good for the people to know and what is not good for them to know." RCW 42.30.010. The fact that "the people" in this case includes the Port's competitors is not an independent justification for shielding a broader swathe of the Port's discussions.

Moreover, the Port's analysis of these pragmatic implications founders on the facts. The Port bluntly stated that the commissioners were not involved in lease negotiations. Minimum price is determined by staff and, according to the commissioners, largely accepted by the board, as commissioners have neither the time nor the manpower to conduct their own research. Thus, it is unclear how the Port justifies extensive executive meetings to arrive at a minimum price when the commissioners are explicitly not involved in its development and quickly approve its proposal.

Nor does the public's participation weigh solely on the side of impracticality. For instance, when the public participated in the Port's July 22 public meeting, comments sparked a proposed lease provision requiring the Port's preapproval of the project's safety plan. Without the public's participation, this provision would, perhaps, have gone unconsidered. Amid this discussion of practicalities, it is worth remembering that the public can also substantively contribute.

In sum, carefully limiting discussion in executive discussion is far from absurd. The most immediate impact would be the presence of substantially fewer—or

substantially shorter—executive sessions. Public meetings would thus include the bulk of a government entity's discussions.

Applying our analysis to the Port's facts, we see some initial practical impacts as follows—public meetings would review a lease's potential impacts on local jobs, local spending, environmental risks, public safety, and risks to neighboring tenants.[18] For instance, discussion of Tesoro-Savage's limited liability structure would take place in public, exploring the possible need for environmental cleanup, the limits on the prospective tenant's ability to pay, and the role of insurance in responding to uncovered risks. After a full discussion of these issues in public, the Port's commissioners would then enter executive session to establish the dollar impact on the acceptable lease price—setting the new minimum value. Having established this minimum value, the commissioners would return to discussing the project in public session. In contrast to this hypothetical scenario, the Port's broad interpretation of the

---

[18] In oral argument and in amicus briefing, the parties contemplate an alternate scenario in which government entities do not increase the number of public meetings, but instead decline to discuss important issues either in public or in executive sessions. *See* Wash. Supreme Court oral argument, *Columbia Riverkeeper v. Port of Vancouver, USA*, No. 92455-4 (Feb. 16, 2017) at 12 min., 22 sec., *audio recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. In this scenario, entities like the Port would conduct the bulk of their communications in writing or in one-on-one conversations between individual commissioners and staff (which are not generally subject to public meeting requirements). Riverkeeper appears to concede that this result is permissible, though it would defeat the OPMA's goal of allowing "the public to know what's going on." *Id.* But we are not asked to consider the implications of such a scenario or whether government entities could effectively shield their deliberations by engaging only indirectly through staff and written memoranda. To the extent that such a stratagem would deliberately undercut the central purpose of the OPMA, it is a deeply troubling hypothetical.

statute would allow the vast majority of discussions pertaining to the sale or lease of real estate to continue taking place behind closed doors.

Again, we stress that it is the role of the legislature to balance the practical implications and possible disadvantages of the OPMA. Policy arguments cannot alter the plain language of the exception, which requires discussions in executive session to explicitly and narrowly focus on the minimum value to sell or lease property. We are not "authorized to rewrite a statute because [we] might deem its effects susceptible of improvement." *Badaracco v. Comm'r*, 464 U.S. 386, 398, 104 S. Ct. 756, 78 L. Ed. 2d 549 (1984). As a result, where the Port would interpret "[t]o consider the minimum price" (RCW 42.30.110(1)(c)) to involve consideration of "the key deal factors that drive the minimum price," we lack authority to so modify the statutory phrase. Port Br. at 3.

III. <u>Summary Judgment Was Inappropriate</u>

Now we must consider the Port's five meetings in light of our interpretation of the "minimum price" exception. Construing the facts in favor of Riverkeeper, each of the meetings discussed factors relevant to the lease price but was not focused on setting the minimum price itself. The March 26, 2013, meeting discussed the duration for the "proposed exclusivity agreement" the Port planned to enter, as well as an update on the negotiated lease terms. Riverkeeper Br. at 12. The July 9, 2013, meeting discussed Tesoro-Savage's formation of a limited liability corporation and whether the new entity would be able to pay for possible environmental cleanup. *Id.* at 16. The July 16 and 17, 2013, sessions discussed, among other topics,

construction timelines, who would be responsible for construction costs, what types of petroleum products would flow through the facility, "'risk associated with any of the potential crude oil,'" and related insurance requirements. *Id.* at 17. The July 23, 2013, meeting discussed requiring the Port's approval of the project's safety plan before the project could commence operation. *Id.* at 20. Taken in the light most favorable to Riverkeeper, summary judgment for the Port was plainly inappropriate. Therefore, we reverse the entry of summary judgment and remand the case for further proceedings consistent with this interpretation of the OPMA.[19]

## CONCLUSION

The OPMA broadly mandates transparency in Washington government. Its protections must be liberally construed and its exceptions narrowly construed. Therefore, the exception permitting executive sessions to consider the minimum price at which to offer public land for sale or lease must be read narrowly. The plain language of the provision confines discussion in executive session to the lowest acceptable value to offer land for sale or lease, and does not permit discussion of all factors that influence price. This narrow interpretation is consistent with the provision's legislative history, which limited executive sessions "to deciding how high or how low [government entities] are willing to go." Mar. 2, 1979, Floor Proceedings

---

[19] Riverkeeper also requests that it be awarded costs and fees related to this appeal "only upon a determination that the Board violated OPMA." Pet'rs' Reply in Supp. of Mot. for Appellate Fees at 2. Because we merely reverse the entry of summary judgment for the Port and do not enter summary judgment for Riverkeeper, we decline to award appellate fees and costs. Any allocation of costs and fees will abide the outcome of the case on remand.

at 73:59 to 74:03 (statement of Sen. Wilson). "All other aspects relating to the sale or lease of the property . . . have to be conducted in open meeting[s] . . ." *Id.* at 74:09 to 74:26. In practice, this means that a government entity's discussion of the factors comprising value must occur in public. While conversation in executive session may address how these factors impact the minimum price, these contextual references cannot themselves become the focus of discussion.

Construing the facts in the light most favorable to Riverkeeper, the Port's five executive sessions at issue here concerned factors influencing price and were not themselves focused on arriving at a minimum price. As a result, we reverse the grant of summary judgment as to the five meetings and remand for further proceedings consistent with our analysis. Any potential award of costs and fees will abide the outcome of the case on remand.

Wiggins, J.

WE CONCUR.

Fairhurst, C.J.

Johnson, J.

Madsen, J.

Owens, J.

Stephens, J.

González, J.

Gordon McCloud, J.

Yu, J.